# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

U.S. Bank National Association,

        Plaintiff,

v.

Equity Bank,

        Defendant.

Civil No. 12-2023 (DWF/HB)

**MEMORANDUM
OPINION AND ORDER**

---

Matthew S. Buckley, Esq., Alex P. Hontos, Esq., Seth J.S. Leventhal, Esq., Steven J. Wells, Esq., and Andrea Caron Wiltrout, Esq., Dorsey & Whitney LLP, counsel for Plaintiff.

Enza G. Boderone, Esq., Russell Koonin, Esq., and Philip R. Stein, Esq., Bilzin Sumberg Baena Price & Axelrod LLP; and Janine Wetzel Kimble, Esq., Jenny Gassman-Pines, Esq., and Erin Sindberg Porter, Esq., Greene Espel PLLP, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on cross-motions for summary judgment brought by Defendant Equity Bank (Doc. No. 120) and Plaintiff U.S. Bank National Association ("U.S. Bank") (Doc. No. 126). Also before the Court is Plaintiff's Motion to Exclude Expert Testimony (Doc. No. 124). For the reasons set forth below, the Court grants in part and denies in part Defendant's motion for summary judgment, grants in part and denies in part Plaintiff's motion for summary judgment, and denies Plaintiff's motion to exclude expert testimony.

**BACKGROUND**

## I.  Factual Background

On May 1, 2007, Plaintiff U.S. Bank, Defendant Equity Bank, Sedgwick County, Kansas, Shawnee County, Kansas, and UMB Bank, N.A., entered into a contractual agreement under which the State of Kansas was authorized to establish a local residential housing finance plan to issue revenue bonds, the proceeds from which would be used to purchase mortgage loans (the "Kansas Agreement").  (Doc. No. 158 ("Buckley Decl. I") ¶ 3, Ex. 1 (the "Kansas Agreement").)  Under the Kansas Agreement, U.S. Bank, as authorized Master Servicer, was to purchase mortgage loans from Equity Bank that were approved as eligible Federal Home Loan Mortgage Corporation ("Freddie Mac") loans. (*See id.* at 6, 19; Doc. No. 57 ("Am. Compl.") ¶ 8.)  Pursuant to the Kansas Agreement, U.S. Bank purchased and then sold two loans originated by Equity Bank, Loan Nos. ****4736 and ****3994, to Freddie Mac.  (Buckley Decl. I ¶ 3, Ex. 2 ("Huber Dep.") at 14-15; Doc. No. 137 ("Sahn Aff.") ¶ 3, Ex. B ("Sparks Dep.") at 52, 67-68; Doc. No. 160 ("Stein Aff.") ¶ 12, Ex. J ("Loan No. ****4736 Closing Documents"); Stein Aff. ¶ 18, Ex. P ("Loan No. ****3994 Underwriting and Transmittal Summary").)

On September 28, 2010, U.S. Bank and Equity Bank entered into a separate contractual agreement under which Equity Bank agreed to offer conventional mortgage loan sales to U.S. Bank (the "Correspondent Agreement").  (Doc. No. 143 ("Buckley Decl. II") ¶ 3, Ex. 6 (the "Correspondent Agreement").)  Under the Correspondent Agreement, Equity Bank sold U.S. Bank over $12 million in loans between September 2010 and August 2012.  (Am. Compl. ¶ 18.)

In May and June 2012, U.S. Bank demanded that Equity Bank repurchase Loan Nos. ****4736 and ****3994 sold to U.S. Bank under the Kansas Agreement because the underlying documentation for the loans allegedly did not meet applicable regulatory guidelines and contained errors and inconsistencies. (*Id.* ¶ 14; Sahn Aff. ¶ 9, Ex. H ("Loan No. ****4736 Repurchase Demand"); Sahn Aff. ¶ 10, Ex. I ("Loan No. ****3994 Repurchase Demand").) Equity Bank refused to repurchase the loans on the grounds that U.S. Bank did not meet the prerequisites for the repurchase demand and did not provide sufficient documentation. (Am. Compl. ¶¶ 15-16.) Specifically, Equity Bank states that U.S. Bank's repurchase demand lacked foundation; that U.S. Bank had not yet repurchased the loans from Freddie Mac and thus did not own the loans that it demanded Equity Bank repurchase; and that U.S. Bank had not suffered any losses relating to the loans. (*Id.*; Stein Aff. ¶ 4, Ex. B ("July 4, 2012 Letter from Equity Bank to U.S. Bank").)

According to Equity Bank, in August 2012, U.S. Bank unilaterally and improperly deducted the entire servicing-release premium owed to Equity Bank for loans purchased under the Correspondent Agreement as punishment for not repurchasing Loan Nos. ****4736 and ****3994 under the Kansas Agreement. (Am. Compl. ¶ 21; Huber Aff. ¶¶ 12-13.) U.S. Bank also notified Equity Bank that it would continue to deduct premiums owed to Equity Bank as a set-off on all remaining loans it had purchased from Equity Bank under the Correspondent Agreement. (Am. Compl. ¶ 24; Buckley Decl. II ¶ 3, Ex. 8 ("Romine Dep.") at 4.) U.S. Bank further informed Equity Bank that it would no longer honor the Correspondent Agreement going forward with regard to future loan sales by Equity Bank. (Am. Compl. ¶¶ 23, 30-31; Romine Dep. at 5-6.) U.S. Bank

subsequently suspended and then terminated the Correspondent Agreement.  (Romine

Dep. at 5-6; Buckley Decl. II ¶ 3, Ex. 19 ("August 24, 2014 E-mail from U.S. Bank to

Equity Bank").)  Equity Bank alleges that U.S. Bank's rationale for its actions was "to

punish Equity Bank for its refusal to repurchase the loans."  (Am. Compl. ¶ 23.)

According to Equity Bank, in August 2012, U.S. Bank notified First Community

Bank that it would discontinue doing business with First Community Bank because of

First Community Bank's pending merger with Equity Bank.  (*Id.* ¶¶ 27-29, 31-32;

Buckley Decl. II ¶ 3, Ex. 22 ("Elliott Dep.") at 8-9; Stein Aff. ¶ 6, Ex. D ("August 20,

2012 E-mail from U.S. Bank to First Community Bank").)  Equity Bank alleges that

U.S. Bank's intention was to further punish Equity Bank for its refusal to repurchase the

loans under the Kansas Agreement.  (Am. Compl. ¶ 30.)  Equity Bank states that its

business declined dramatically due to U.S. Bank's punitive actions.  (*Id.* ¶ 34.)

## II.    Procedural History

On August 17, 2012, U.S. Bank filed suit against Equity Bank in the District of

Minnesota.  (Doc. No. 1 ("Compl.").)  One week later, on August 24, 2012, Equity Bank

brought suit against U.S. Bank in the District of Kansas.  (Doc. No. 1 (Case

No. 12-cv-1311).)  On November 15, 2012, the Kansas Court transferred Equity Bank's

case to this District (Doc. No. 16 (Case No. 12-cv-1311)), and the two cases were

subsequently consolidated in the above-entitled matter (Doc. No. 36).

On November 30, 2012, U.S. Bank filed an Amended Complaint against

Equity Bank.  (Doc. No. 26 ("Am. Compl.").)  In its Amended Complaint, U.S. Bank

asserts the following claims against Equity Bank:  (I) breach of contract (by selling

U.S. Bank loans that did not meet the specifications and requirements of the Kansas Agreement); (II) breach of contract (by failing to repurchase the loans on demand by U.S. Bank under the Kansas Agreement); (III) breach of contract (by failing to repurchase the loans and refusing to indemnify U.S. Bank for its losses from the repurchase demand under the Kansas Agreement); and (IV) contractual and common law indemnification.  (*Id.* ¶¶ 41-63.)

On June 7, 2013, Equity Bank filed an Amended Complaint asserting three claims against U.S. Bank.  (Doc. No. 57 ("Am. Compl.").)  First, Equity Bank seeks declaratory relief as to whether "U.S. Bank has the right to assert such repurchase demands, as to its ownership of the loans and its standing to pursue such claims against Equity Bank, and as to its right under the pertinent factual circumstances to enforce Equity Bank's representations and warranties related to loans"; and "whether some or all of U.S. Bank's demands are barred by the applicable statute of limitations."  (*Id.* ¶¶ 35-40.)  Second, Equity Bank alleges breach of the Correspondent Agreement based on U.S. Bank's refusal to remit to Equity Bank a servicing-release premium payment on each loan sold. (*Id.* ¶¶ 41-47.)  Finally, Equity Bank alleges breach of the implied covenant of good faith and fair dealing under both the Kansas Agreement and the Correspondent Agreement for seeking to "punish Equity Bank . . . because of Equity Bank's good-faith dispute regarding the representations and warranties [of the loans] sold under the Kansas Agreement" and "force Equity Bank to repurchase [the] loans . . . by withholding funds under the Correspondent Agreement and ultimately terminating its relationship with Equity Bank and First Community Bank."  (*Id.* ¶¶ 48-58.)

5

On May 2, 2014, Equity Bank moved for summary judgment on all four claims. (Doc. No. 120.)  On May 14, 2014, U.S. Bank moved for summary judgment on all three claims.  (Doc. No. 126.)  U.S. Bank also moved to exclude Equity Bank's expert testimony.  (Doc. No. 124.)

## DISCUSSION

### I.     Cross-Motions for Summary Judgment

#### A.     Summary Judgment Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or

denials of his pleading, but must set forth specific facts showing that there is a genuine

issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### B. Equity Bank's Motion for Summary Judgment

#### 1. Statute of Limitations

As a threshold matter, Equity Bank argues that U.S. Bank's claims are barred by

Kansas's five-year statute of limitations for breach of contract actions. (*See* Doc.

No. 136 at 30-33.) Equity Bank first contends that the Kansas statute of limitations

applies to U.S. Bank's claims pursuant to both the Kansas Agreement's choice-of-law

provision and the Minnesota Uniform Conflict of Laws-Limitation Act. (Doc. No. 165

at 10-11.) Equity Bank next asserts that Kansas's five-year statute of limitations bars

each of U.S. Bank's claims because both of the loans that form the basis of U.S. Bank's

claims closed in 2007, more than five years before U.S. Bank filed this lawsuit. (*Id.*)

U.S. Bank, on the other hand, argues that all counts in its Amended Complaint are

timely. (Doc. No. 157 at 29.) Although U.S. Bank does not dispute that Kansas

substantive law otherwise governs its claims pursuant to the terms of the Kansas

Agreement, U.S. Bank argues that Minnesota's six-year statute of limitations applies

pursuant to Minnesota choice-of-law rules, under which all of its claims are timely. (*Id.*

at 32-34.) Alternatively, U.S. Bank contends that if Kansas's five-year statute of

limitations applies to its claims, then Counts II, III, and IV are timely because U.S. Bank

filed suit against Equity Bank within months after Equity Bank failed to honor its

contractual repurchase and indemnification obligations. (*Id.* at 29-31.)

The Court first considers the applicable statute of limitations.  "A federal court sitting in diversity applies the statute-of-limitation rules of the forum."  *See Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 992 (8th Cir. 2007) (citing *Nettles v. Am. Tel. & Tel. Co.*, 55 F.3d 1358, 1362 (8th Cir. 1995)).  Under the Minnesota Uniform Conflict of Laws-Limitation Act ("UCLLA"), "if a claim is substantively based . . . upon the law of one state, the limitation period of the state applies."  Minn. Stat. § 541.31.  Here, the governing substantive law is indisputably Kansas law.  Thus, pursuant to the UCLLA, Kansas's statute of limitations will generally apply to U.S. Bank's claims.

However, U.S. Bank contends that the Minnesota statute of limitations applies to Count I of its Amended Complaint under an "escape clause" in the UCLLA, which provides that:

> If the court determines that the limitation period of another state under Sections 541.31 and 541.32 is substantially different from the limitation period of this state and has not afforded a fair opportunity to sue . . . the limitation period of this state applies.

Minn. Stat. § 541.33.  Although U.S. Bank does not contend that Minnesota's six-year statute of limitations is substantially different from Kansas's five-year statute of limitations for breach of contract actions, U.S. Bank argues that it would not have had a fair opportunity to sue on Count I if Kansas's statute of limitations applies.[1]  (Doc. No. 157 at 34.)  U.S. Bank argues that applying Kansas's statute of limitations would

---

[1]    U.S. Bank does not assert any such arguments with respect to Counts II, III, and IV of its Amended Complaint, which U.S. Bank contends are timely under both the Kansas and Minnesota statute of limitations.  (*See* Doc. No. 157 at 34-40.)

deprive it of a fair opportunity to sue on Count I because "[w]ith respect to Loan No. ****3994, for instance, the loan closed on June 12, 2007, and U.S. Bank received notice of the loan's defects from Freddie Mac on May 8, 2012; U.S. Bank was not injured, and had no notice of injury, until that demand was made." (*Id.* at 39-40.) U.S Bank also references "the need to solicit Equity Bank's feedback regarding the defects" with respect to Loan No. ****3994. (*Id.* at 40.)  U.S. Bank offers no specific reason to invoke the escape clause with respect to Loan No. ****4736. (*See id.*)

The Court concludes that the UCLLA escape clause does not apply in the present case.  First, the comments to the UCLLA make clear that the exception should "rarely be employed," and only in "extreme cases."  UCLLA § 4 cmt (2008).  In addition, "[i]t is not enough that the forum state's limitation period is different from that of the state whose substantive law is governing; the difference must be 'substantial,' and the 'fair opportunity' provision constitutes a separate and additional requirement."  *Id.*; *see also Burks v. Abbott Labs.*, 639 F. Supp. 2d 1006, 1019 (D. Minn. 2009) (quoting UCLLA § 4 cmt).  Here, the one-year difference between the statute of limitations in Kansas and Minnesota does not constitute a "substantial" difference required under the UCLLA escape clause.  Moreover, because there is nothing unfair or unreasonable about a five-year statute of limitations, as contrasted with a six-year statute of limitations, the escape clause does not apply.  As such, the Court concludes that Kansas's five-year statute of limitations applies to U.S. Bank's breach of contract claims.

The Court next addresses whether U.S. Bank's breach of contract claims are barred under the Kansas five-year statute of limitations.  *See* Kan. Stat. Ann. § 60-511(1).

"A breach-of-contract claim accrues when the contract is breached, irrespective of plaintiff's knowledge or injury." *Great Plains Trust Co.*, 492 F.3d at 993 (citing *Pizel v. Zuspann*, 795 P.2d 42, 54 (Kan. 1990)); *see also Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 174 F. Supp. 2d 1199, 1203 (D. Kan. 2001) ("[T]he law in Kansas is well-settled that breach of contract accrues at the time of the alleged breach regardless of the knowledge of the breach by the plaintiff at the time.").

With respect to Count I, U.S. Bank's breach of contract claim arises from Equity Bank's origination and sale of two loans to U.S. Bank that allegedly did not comply with applicable regulatory guidelines and other specified requirements under the Kansas Agreement. Because those loan closings, subject loan file transfers, and corresponding representations were made as of June 12, 2007 and August 2, 2007, the latest date that U.S. Bank's claim could have accrued was August 2, 2007. Because U.S. Bank did not file this action until August 17, 2012, more than five years after the claim accrued, Count I is untimely under the Kansas statute of limitations. Accordingly, Equity Bank's motion for summary judgment as to Count I is granted.

With respect to Counts II, III, and IV, Equity Bank argues that U.S. Bank's claims are based on the same underlying representations and warranties to U.S. Bank that were made at the time of closing of the two loans and, thus, are also untimely under Kansas's five-year statute of limitations for breach of contract actions. (Doc. No. 136 at 4-5.) Equity Bank asserts that "[w]hile U.S. Bank may feel that it is entitled to seek a remedy for alleged breach of contract in the form of a loan repurchase or an indemnification payment, U.S. Bank fails to show how Equity [Bank]'s alleged refusal or failure to

provide U.S. Bank with those demanded remedies somehow gives rise to separate and distinct causes of action at law." (*Id*. at 23.)  Equity Bank further asserts that "even assuming that U.S. Bank had a legal right to demand payment from Equity (it does not), that right accrued at the time of sale[,] []irrespective of when U.S. Bank discovered the alleged breaches or when U.S. Bank was allegedly injured." (Doc. No. 165 at 8.)

U.S. Bank, however, maintains that "Counts II through IV do not run afoul of the relevant Kansas statute of limitations." (Doc. No. 157 at 35-36.)  U.S. Bank asserts that "Counts II, III, and IV in the Amended Complaint rest on different obligations than Count I" for statute of limitations purposes. (*Id.* at 34-35; *see also id.* at 26 (stating that "[t]he Kansas Agreement contained separate provisions granting U.S. Bank remedies if and when Equity Bank violated these representations and warranties—i.e., Equity Bank's repurchase and indemnification commitments in Section 3.13.  Those separate, distinct commitments ground Counts II and III (as well as Count IV, to the extent that Count seeks contractual indemnification)").)  U.S. Bank relies on *Hewitt v. Kirk's Remodeling & Custom Homes, Inc.*, 310 P.3d 436 (Kan. Ct. App. 2013), as authority for the proposition that different contractual promises support different causes of action. (Doc. No. 157 at 35-36.)  U.S. Bank argues that Counts II, III, and IV are timely under *Hewitt* because a separate, independent breach of contract occurred when Equity Bank failed to repurchase the loans at issue and indemnify U.S. Bank for its losses.[2] (*See id*.)  As a

---

[2]     Specifically, U.S. Bank states that "Count II alleges that Equity Bank breached the Kansas Agreement by failing to repurchase the . . . loans on demand by U.S. Bank, for

(Footnote Continued on Next Page)

result, U.S. Bank asserts that the Kansas statute of limitations accrued in 2012, rather

than 2007, and that "U.S. Bank brought suit against Equity Bank within months after

Equity Bank failed to honor its repurchase and indemnification requirements." (*Id.*

at 34-37.)  Thus, U.S. Bank argues that Counts II, III, and IV are timely under the Kansas

five-year statute of limitations.  (*See id.* at 36-37.)

As stated previously, the law in Kansas is well-settled that "[a] breach-of-contract

claim accrues when the contract is breached, irrespective of plaintiff's knowledge or

injury."  *Great Plains Trust Co.*, 492 F.3d at 993 (citing *Pizel*, 795 P.2d at 54).  The

Court finds U.S. Bank's "independent breach" arguments to be unpersuasive.  First, the

Court concludes that the repurchase and indemnification requirements under Section 3.13

of the Kansas Agreement merely provide for a remedy in the event of a breach, not

independent grounds for a suit.[3]  Section 3.13 states that in the event of a breach of one of

Equity Bank's representations and warranties:

---

(Footnote Continued From Previous Page)

which, by contract, Equity Bank had assumed responsibility"; "Count III alleges that
Equity Bank further breached the Kansas Agreement by refusing to indemnify U.S. Bank
for its losses from Freddie Mac's repurchase demand and failing to repurchase the
relevant loans, which, by contract, it had assumed responsibility to do"; and "Count IV
alleges that U.S. Bank is entitled to both contractual and common-law indemnification
based on, among other things, the fact that Freddie Mac forced U.S. Bank to repurchase
the above-referenced loans because of wrongful acts or omissions and defects in the loans
for which Equity Bank . . . bore responsibility."  (Doc. No. 157 at 35 (internal citations
and quotations omitted).)

[33]      In addition, to the extent that U.S. Bank relies on Section 8.09 of the Kansas
Agreement in support of its breach of contract claim in Count III, the Court's conclusion
(Footnote Continued on Next Page)

> Then the sole remedy of the parties hereto shall be to require the Lender [Equity Bank] to cure the defect or foreclose and/or purchase the Mortgage Loan, as described in this Section. . . .  The Lender, at the discretion of the Master Servicer [U.S. Bank], may be required to repurchase the affected Mortgage Loan from the Master Servicer subject to the terms and conditions of this Section 3.13.  The Lender will indemnify and hold harmless . . . the Master Servicer . . . for any loss, damage, or expense (including any reasonable attorney fees) incurred by them in connection with the Mortgage Loan which is being purchased.

(Kansas Agreement § 3.13.)  Here, the contract provision explicitly states that the "sole" remedy available to U.S. Bank is to require Equity Bank to cure and/or repurchase the loans and seek indemnification for any losses incurred in connection with the purchase of the loans.  A remedial provision, such as this cure/repurchase/indemnify clause, does not extend the time in which a claim accrues.  The parties could have expressly provided in their contract that failure to repurchase or indemnify is a separate breach and that a remedy exists for that failure—they did not.  "It is not the function of courts to make contracts, but to enforce them as made."  *Tri-State Hotel Co. v. Sphinx Inv. Co.*, 510 P.2d 1123, 1225 (Kan. 1973).

In addition, the Court is not persuaded that *Hewitt* supports U.S. Bank's position.  U.S. Bank cites *Hewitt* as "establishing" its independent breach theory.  (*See* Doc. No. 157 at 30.)  In *Hewitt*, the Kansas Court of Appeals held that the Kansas statute of limitations started to run not when a home construction defect was discovered, but from

---

(Footnote Continued From Previous Page)

remains unchanged for the same reasons discussed with respect to Section 3.13 of the Kansas Agreement.

the breach of an express "Repair or Replace Warranty." *See Hewitt*, 310 P.3d at 444-46.

However, in *Hewitt*, unlike the present case, the plaintiff alleged breach of contract based

on two express warranties by a homebuilder—to deliver a home free of defects and to

repair or replace construction defects that arose during a one-year warranty period. *See

id.* at 440-41. Here, the Kansas Agreement contains no such prospective warranty

regarding future defects or misrepresentations with respect to the loans. Additionally,

U.S. Bank's claims are premised on alleged defects that existed in the original loan-file

documentation prepared by Equity Bank for the loans sold to U.S. Bank and

Equity Bank's corresponding representations and warranties as to its compliance with

applicable loan origination requirements.

Although Kansas courts have not directly addressed this issue, courts in other

jurisdictions have generally applied this reasoning in addressing loan repurchase and

indemnification breach of contract claims. For example, New York courts have

repeatedly dismissed breach of contract causes of action based on allegedly independent

breaches of repurchase obligations, rather than on the underlying breaches of the

representations and warranties regarding the mortgage loans, in the context of

determining when a statute of limitations begins running. *See, e.g.*, *Nomura Asset

Acceptance Corp. Alt. Loan Trust, Series 2005-S4 ex rel. HSBC Bank USA, Nat'l Ass'n v.

Nomura Credit & Capital, Inc.*, No. 653541/2011, 2013 WL 2072817, at *8-9 (N.Y. Sup.

Ct. May 10, 2013) (dismissing the plaintiff's claims as time-barred and concluding that a

loan seller's failure to repurchase nonconforming loans on demand does not constitute an

independent breach of contract separate from the underlying representations); *see also*

*Ace Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA,*

*Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 552 (S.D.N.Y. 2014)

(noting that "courts have often approached this issue in the context of determining when a

statute of limitations began running, but that question is inextricably intertwined with

Plaintiff's theory that it may bring separate contract claims based on [Defendant's] failure

to repurchase breached loans[,] which would effectively allow a plaintiff to extend the

statute of limitations for breach of warranty claims").

　　　　Based upon the above reasoning, the Court concludes that, contrary to U.S. Bank's

assertions, Equity Bank's refusal to repurchase the alleged defective loans and indemnify

U.S. Bank for its alleged losses do not constitute independent breaches of contract

separate and apart from the initial representations and warranties at the time of closing,

and thus do not restart the statute of limitations for accrual purposes.  U.S. Bank's breach

of contract claims accrued when a breach of the representations and warranties in the

Kansas Agreement occurred, not when Equity Bank either failed to timely repurchase a

defective loan or indemnify U.S. Bank for its losses.  The first alleged breach of a

representation or warranty occurred in June 2007 when the first loan was originated, thus

triggering Equity Bank's duty to repurchase the loan and the running of the statute of

limitations.  Accordingly, Equity Bank is entitled to summary judgment on U.S. Bank's

remaining breach of contract claims in Counts II and III.

　　　　Although the parties do not distinguish Count IV from Counts II and III in their

statute of limitations arguments, the Court must consider Count IV separately for statute

of limitations purposes because Count IV asserts contractual and common law

indemnification claims rather than breach of contract claims.  (*See* Am. Compl.

¶¶ 56-63.)  For purposes of determining the applicable statute of limitations, the Court

first construes U.S. Bank's claims as to Count IV.  Kansas courts have recognized two

situations in which indemnity claims are allowed:

> The first occurs where there is an expressed contract of indemnity, such as a "hold harmless" agreement.  The second occurs where a contract of indemnity may be implied when one is compelled to pay what another party ought to pay.  The implied or constructive liability usually arises when one personally, without fault, is made to pay for a tortious act of another.  The person paying has a right of action against the person at fault.

*Haysville U.S.D. No. 261 v. GAF Corp.*, 666 P.2d 192, 199 (Kan. 1983); *see also Nolde*

*v. Hamm Asphalt, Inc.*, 202 F. Supp. 2d 1257, 1266 (D. Kan. 2002) (providing that an

express indemnity requires a written indemnity agreement or provision).

U.S. Bank's indemnity claims encompass both of these recognized

indemnification actions under Kansas law.  *See Haysville*, 666 P.2d at 199.  First, with

respect to its contractual indemnification claim, U.S. Bank relies on Section 8.09 of the

Kansas Agreement, which states, in relevant part:

> Each Lender [Equity Bank] shall indemnify . . . the Master Servicer [U.S. Bank] . . . and hold them harmless of and from any and all loss, penalty, fine, forfeiture, reasonable attorneys' fees, damage or expense (collectively, 'Losses') that [it] may sustain or incur as a result of any material failure on the part of such Lender to perform its services, duties and obligations under the terms and provisions of this Agreement.

(Kansas Agreement § 8.09.)  This "hold harmless" agreement can be characterized as an

express indemnity contractual provision under Kansas law.  Because U.S. Bank's

contractual indemnification claim is premised on an "agreement, contract or promise in

writing"—Section 8.09—the Court concludes that the five-year Kansas statute of

limitations governs.  *See* Kan. Stat. § 60-511(1) (providing that "[a]n agreement upon any agreement, contract or promise in writing" shall be brought within five years).

The Court finds that U.S. Bank's contractual indemnification claim in Count IV is timely because the claim accrued at the time when U.S. Bank first sustained its alleged losses on or around July of 2012 when it repurchased Loan No. ****4736, and U.S. Bank filed suit within five years, on August 17, 2012.  Therefore, the Court concludes that U.S. Bank's contractual indemnification claim in Count IV is not time-barred under the applicable Kansas statute of limitations.

Finally, with respect to U.S. Bank's remaining indemnification claim in Count IV, the Court considers U.S. Bank's common law indemnification claim as an implied contract of indemnity under Kansas law.  *See Haysville*, 666 P.2d at 199. Because U.S. Bank argues that, among other things, Equity Bank must indemnify U.S. Bank for its repurchase payments for the allegedly defective loans, the Court finds that U.S. Bank's claim can be characterized as a situation in which "one [party] is compelled to pay what another party ought to pay" under Kansas law.  *See id.* Because U.S. Bank's common law indemnification claim is premised "upon contracts, obligations or liabilities expressed or implied but not in writing"—an implied liability— the Court concludes that the three-year Kansas statute of limitations applies.  *See* Kan. Stat. § 60-512 (providing that "[a]ll actions upon contracts, obligations or liabilities expressed or implied but not in writing" shall be brought within three years).  The Court finds that U.S. Bank's common law indemnification claim is timely because U.S. Bank filed suit within one year that the claim accrued—in 2012, when U.S. Bank alleges that it

was compelled by Freddie Mac to repurchase the loans.  Therefore, the Court concludes

that U.S. Bank's common law indemnification claim in Count IV is not time-barred

under the applicable statute of limitations.

## 2.    Indemnification

Equity Bank also argues that it is entitled to summary judgment on U.S. Bank's

indemnification claims because U.S. Bank's repurchase of the loans from Freddie Mac

was voluntary and because U.S. Bank cannot establish that its alleged damages were

caused by any act or omission by Equity Bank.  (*See* Doc. No. 136 at 24-25.)

Equity Bank first asserts that "U.S. Bank cannot properly attempt to seek indemnification

from Equity [Bank] under the Kansas Agreement for payments that U.S. Bank was under

no obligation to make."  (Doc. No. 159 at 26.)  Equity Bank further asserts that it "has no

obligation to indemnify U.S. Bank for U.S. Bank's admitted breach of its subsequent,

independent agreements with Freddie Mac."  (Doc. No. 136 at 28.)  Finally, Equity Bank

asserts that "U.S. Bank was never sued by Freddie Mac, nor by the Trustee or Issuers

under the Kansas Agreement," yet "U.S. Bank nevertheless made payments to Freddie

Mac voluntarily, presumably for its own self-serving political reasons."  (*Id.* at 30.)

Thus, according to Equity Bank, "[s]uch a baseless attempt to avoid its own liability to

Freddie Mac (if any actually exists) is both unconscionable and unsupported under both

the terms of the Kansas Agreement and applicable Kansas law."  (*Id.*)

U.S. Bank, on the other hand, argues that its repurchase demand was an exercise

of its rights under Section 3.13 of the Kansas Agreement and that Equity Bank was

required to repurchase the loans.  (*See* Doc. No. 157 at 29.)  U.S. Bank first argues that

Equity Bank's conduct proximately caused U.S. Bank's damages.  (*Id.*)  U.S. Bank
asserts that the defects in the loans that triggered the repurchase demand by Freddie Mac
resulted from the failure of Equity Bank to comply with its warranty that the loans it sold
would comply with federal guidelines.  (*Id.* at 32.)  U.S. Bank further contends that
Equity Bank knew it had to comply with Freddie Mac guidelines under Section 2.04(m)
of the Kansas Agreement and knew that U.S. Bank could re-sell the loans originated by
Equity Bank to Freddie Mac under Section 3.13 of the Kansas Agreement, and thus,
"[w]hen U.S. Bank repurchased Loan Nos. ****4736 and ****3994 and Equity Bank
then refused to repurchase them from U.S. Bank, the damage to U.S. Bank was, in every
sense, 'foreseeable.'"  (*Id.* at 30.)  U.S. Bank contends that Equity Bank is not absolved
of all responsibility for the defects in its loans simply because U.S. Bank failed to catch
those defects before the loans were re-sold to Freddie Mac.  (*Id.* at 31-32.)  Finally, U.S.
Bank argues that the limited carve-outs from Equity Bank's indemnification
responsibilities do not apply here, where the problems in the relevant loans resulted from
Equity Bank's non-compliance with applicable federal guidelines.  (*Id.*)

The Court concludes that issues of material fact remain to preclude summary
judgment for Equity Bank on Count IV of U.S. Bank's Amended Complaint.  *See Enter.
Bank*, 92 F.3d at 747.  The Court determines that the plain language of the express
indemnification provision upon which U.S. Bank relies provides that Equity Bank shall
indemnify U.S. Bank for losses that it "may sustain or incur as a result of any *material
failure on the part of such Lender to perform its services, duties and obligations under
the terms and provisions of this Agreement*."  (Kansas Agreement § 8.09 (emphasis

added).)  However, the Court finds that there is a question of fact presented in the record currently before the Court such that the Court cannot determine as a matter of law whether U.S. Bank's losses were the result of a "material failure" by Equity Bank.  In addition, the parties dispute whether the alleged defects in Loan Nos. ****4736 and ****3994 were material, a factual issue that precludes summary judgment in favor of Equity Bank.  Because issues of material fact remain, the Court declines to grant Equity Bank's motion for summary judgment with respect to Count IV.

### C.      U.S. Bank's Motion for Summary Judgment

#### 1.      Count I

U.S. Bank argues that it is entitled to summary judgment on Count I of Equity Bank's Amended Complaint, which seeks declaratory relief that U.S. Bank's repurchase demands were invalid.  U.S. Bank argues that its repurchase demands were valid because Loan Nos. ****4736 and ****3994 contained material defects.  (Doc. No. 141 at 35.)  Equity Bank, on the other hand, argues that the alleged loan defects did not constitute material defects or, alternatively, were cured.  (Doc. No. 159 at 19.)  Equity Bank further asserts that, "[a]t the very least, the issue of the Loans' 'defects' is a question of fact for a jury to consider."  (*Id.* at 23.)  The Court agrees.

As the Court has previously concluded, material issues of fact remain with respect to whether the alleged defects in Loan Nos. ****4736 and ****3994 were material.  Accordingly, the Court concludes that summary judgment on Count I of Equity Bank's Amended Complaint is inappropriate in light of the existing record before the Court.  Therefore, the Court denies U.S. Bank's request for summary judgment as to Count I.

### 2.  Count II

U.S. Bank contends that it is entitled to summary judgment on Count II of Equity Bank's Amended Complaint, which alleges that U.S. Bank breached the Correspondent Agreement by withholding service-release premiums to which Equity Bank was entitled under the Correspondent Agreement.  U.S. Bank first argues that it was "within its contractual rights to offset the amounts owed to it by [Equity Bank]" because "the Correspondent Agreement unequivocally gives [U.S. Bank] the 'right to deduct any penalties, fees, taxes, or other charges or obligations of any kind owed by [Equity Bank] to [U.S. Bank] from the amount to be paid for any Mortgage Loan purchased by [U.S. Bank] hereunder.'"  (Doc. No. 167 at 13 (quoting Correspondent Agreement ¶ 16).)  U.S. Bank asserts that Equity Bank's "unsupported contentions regarding the intention of this provision do not give rise to an issue of material fact."  (Doc. No. 167 at 13.)  U.S. Bank argues that its right to offset is based on Equity Bank's refusal to meet its obligations to repurchase Loan Nos. ****4736 and ****3994 and to indemnify U.S. Bank for its own repurchase of them.  (Doc. No. 141 at 34-35.)  Therefore, U.S. Bank argues that Count II must be dismissed.

Equity Bank, on the other hand, argues that U.S. Bank could not claim a right to "set-off" under the Correspondent Agreement and thereby collect funds to which it was plainly not entitled under the Kansas Agreement.  (*See* Doc. No. 159 at 43.)  Equity Bank maintains that "[t]he Correspondent Agreement governed the parties' relationship with respect to a residential mortgage loan program that had absolutely nothing to do with the Kansas Agreement or the Loans."  (*Id.*)  Equity Bank argues that "U.S. Bank

misinterprets the plain purpose and effect of the off-set provision" because "[t]he offset

provision is not intended, as U.S. Bank suggests, to allow U.S. Bank to 'make itself

whole' for any alleged debts, even ones *not* related to the Correspondent Agreement and

*not* owed under a separate agreement." (*Id.*)  Equity Bank further contends that "[a]t the

very least, Equity [Bank]'s breach of contract claim requires resolution of disputed facts

as to whether Equity [Bank] owed anything related to these Loans." (*Id.*)  Finally,

Equity submits that because the Court has not yet ruled on whether Equity Bank had any

obligation to repurchase the loans at issue from U.S. Bank, "Equity [Bank]'s claims

regarding U.S. Bank's unlawful withholding of the service-release premiums cannot be

resolved in U.S. Bank's favor at the summary judgment stage." (*Id.* at 44.)

The parties do not dispute that Minnesota law governs the Correspondent

Agreement.  Under Minnesota law, when interpreting a contract, Minnesota courts

attempt to determine the intent of the parties from the language of the contract.  *See

Savela v. City of Duluth*, 806 N.W.2d 793, 796 (Minn. 2011); *Motorsports Racing Plus,

Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003).  "A contract is

ambiguous if, based upon its language alone, it is reasonably susceptible of more than

one interpretation."  *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511,

515 (Minn. 1997).  If contract language is unambiguous, "courts should not rewrite,

modify, or limit its effect by a strained construction."  *Travertine Corp. v. Lexington-

Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004).

The Court concludes that the plain language of the Correspondent Agreement

provides U.S. Bank with "the right to deduct any penalties, fees, taxes, or other charges

or obligations of any kind owed by [Equity Bank] to [U.S. Bank] from the amount to be paid for any Mortgage Loan purchased by [U.S. Bank] hereunder." (Correspondent Agreement ¶ 16 ("Right of Offset").) The "Right to Offset" provision expressly grants U.S. Bank with the right to offset "charges or obligations of *any kind*." (*Id.* (emphasis added).) Without more specific contractual language or other evidence of agreement, the Court concludes that U.S. Bank's right to offset includes any payments owed to U.S. Bank, including payments purportedly owed to U.S. Bank by Equity Bank under the Kansas Agreement.

However, the Court finds that a substantial fact question exists as to whether U.S. Bank's offset of the loan repurchase breached the Right of Offset provision. Although the Right of Offset provision provides U.S. Bank with the right to deduct charges or obligations of any kind owed by Equity Bank to U.S. Bank, as the Court discussed previously, significant fact issues remain unresolved as to whether Equity Bank owed any payments to U.S. Bank under the Kansas Agreement. *See Enter. Bank*, 92 F.3d at 747. Therefore, because factual questions exist with respect to U.S. Bank's offset of the payments and Equity Bank's obligations to repurchase the loans at issue, the Court declines to grant summary judgment on Count II.

### 3. Count III

U.S. Bank argues that it is entitled to summary judgment on Count III of Equity Bank's Amended Complaint because Equity Bank "fails to identify any legal basis for, or evidence to support, any element of its implied covenant claim." (Doc. No. 167 at 1.) First, U.S. Bank contends that the Correspondent Agreement between U.S. Bank

and Equity Bank and the Correspondent Agreement between U.S. Bank and

First Community Bank (the "Correspondent Agreements") were terminable at will.  (Doc.

No. 141 at 13.)  U.S. Bank maintains that under Minnesota law, the governing law of the

Correspondent Agreements, U.S. Bank's exercise of an express right to terminate its at-

will agreements cannot give rise to an implied covenant claim.  (Doc. No. 167 at 3.)

Second, U.S. Bank argues that Equity Bank's implied covenant claim "must also be

dismissed for the independent reason that there is no evidence whatsoever of 'bad faith.'"

(*Id.* at 8.)  Finally, U.S. Bank argues that there is no admissible evidence to show that

U.S. Bank's actions caused Equity Bank's alleged damages or that a causal relationship

exists between U.S. Bank's termination of the Correspondent Agreements and any

decision of another bank to not buy loans from First Community Bank.  (*Id.* at 9-10.)

Equity Bank, however, argues that U.S. Bank breached the implied covenant of

good faith and fair dealing in both the Kansas Agreement and the Correspondent

Agreement.  (*See* Doc. No. 159 at 17-18.)  First, Equity Bank argues that U.S. Bank

breached the implied covenant "by terminating the Correspondent Agreements and by

withholding funds owed to Equity Bank under the Kansas Agreement" to "pressure

Equity [Bank] to accede to its repurchase demand, or alternatively, to punish

Equity [Bank] for refusing to do so."  (*See id.* at 31.)  Second, Equity Bank argues that

U.S. Bank acted in bad faith by refusing to discuss loan repurchase matters with

Equity Bank or provide evidence of payments for which it sought reimbursement.  (*See

id.* at 28; *see also* Huber Aff. ¶¶ 8-10.)  Finally, Equity Bank argues that it sustained

damages "[a]s a consequence of U.S. Bank's disruption and degradation of

[First Community Bank]'s mortgage operations." (Doc. No. 159 at 40.) Specifically, Equity Bank asserts that "[a]s a result of U.S. Bank's actions, [First Community Bank] lost $23 million in market value, or roughly one-third of the consideration Equity [Bank] paid for [First Community Bank]." (*Id.*)

Under both Kansas and Minnesota law—the governing laws of the Kansas Agreement and the Correspondent Agreement, respectively—the duty of good faith and fair dealing is implied in contracts. *See Estate of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 711 (Kan. 2009); *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998). Both Kansas and Minnesota law recognize that a party breaches the covenant only when it impairs or impedes the other party's ability to perform or denies the party rights and benefits due under the contract. *See In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995); *Daniels v. Army Nat'l Bank*, 822 P.2d 39, 43 (Kan. 1991); *First Nat'l Bank of Omaha v. Centennial Park, LLC*, 303 P.3d 705, 729 (Kan. Ct. App. 2013).

The Court concludes that Equity Bank's implied covenant claim cannot survive summary judgment. First, the Court finds that Equity Bank fails to present a legally cognizable implied covenant claim arising from U.S. Bank's termination of the Correspondent Agreement. The Court concludes, and Equity Bank does not appear to dispute, that the Correspondent Agreement contains an express "termination-at-will" clause that could be invoked by either party at any time. (*See* Correspondent Agreement ¶ 20.) The Court determines that U.S. Bank's invocation of its contractual right to terminate its Correspondent Agreement with Equity Bank, standing alone, does not

25

constitute a breach of the implied covenant.  *See Crowell v. Campbell Soup Co.*, 264 F.3d

756, 765 (8th Cir. 2001) (applying Minnesota law); *see also Burnette Techno-Metrics,*

*Inc. v. TSI Inc.*, 44 F.3d 641, 643 (8th Cir. 1994) (applying Minnesota law and finding

that "[t]he implied covenant of good faith and fair dealing does not affect the clear

language of the termination clause"); *Sterling Capital Advisors*, 575 N.W.2d at 125

(ruling that a party to a contract does not act in bad faith by enforcing its contractual

rights).[4]  In addition, although Equity Bank argues that U.S. Bank exercised its

contractual right to terminate the Correspondent Agreement "to effectuate a back-door

termination of its entire business relationship with Equity [Bank]" for punitive purposes

(*see* Doc. No. 159 at 17-18), Equity Bank presents no evidence to support its argument.

Speculation about U.S. Bank's motives in terminating the Correspondent Agreement is

insufficient for summary judgment purposes.  *See Enter. Bank*, 92 F.3d at 747.

The Court finds Equity Bank's other arguments in support of its implied covenant

claim to be similarly without factual support.  First, with respect to Equity Bank's claim

that U.S. Bank breached the implied covenant by withholding funds allegedly owed to

Equity Bank under the Kansas Agreement in an effort to "pressure Equity [Bank] to

---

[4]     The Court concludes that Equity Bank's reliance on *White Stone Partners, LP v.*
*Piper Jaffray Cos.*, 87 F. Supp. 878 (D. Minn. 1997), is misplaced because unlike the
contract at issue in *White Stone Partners*, the agreement here did not grant Equity Bank
unlimited discretion to invoke a contractual escape clause.  *See id.* at 881; *see also Best*
*Vendors Co. v. Air Express*, No. 00-2224, 2002 WL 31163039, at *6 (D. Minn. Sept. 23,
2002) (finding *White Stone Partners* inapplicable to a case involving a mutual
termination clause and granting summary judgment on the defendant's breach of implied
covenant counterclaim).

accede to its repurchase demand, or alternatively, to punish Equity [Bank] for refusing to do so" (Doc. No. 159 at 31), the Court finds that the record contains no evidence to support this contention. Second, with respect to Equity Bank's claim that U.S. Bank breached the implied covenant by refusing to discuss loan repurchase matters with Equity Bank or provide evidence of payments for which it sought reimbursement (*see id.* at 28), the Court concludes that Equity Bank presents insufficient evidence to support its claim. Finally, the Court concludes that, contrary to Equity Bank's assertions, the evidence does *not* "demonstrate[] unequivocally that Equity [Bank]'s mortgage operations were so hampered by U.S. Bank's bad faith actions that Equity [Bank] suffered a diminution of value equal to $23 million" (*Id.* at 5). The Court finds that the record lacks any admissible evidence to support a finding that U.S. Bank's alleged breach of the implied covenant caused Equity Bank's business to decline dramatically.

Thus, the Court concludes that Equity Bank has not presented sufficient evidence to support a finding that U.S. Bank breached the implied covenant of good faith and fair dealing. *See Enter. Bank*, 92 F.3d at 747. Based on the above analysis, the Court concludes that Equity Bank's implied covenant claims fail to survive summary judgment. Therefore, the Court grants U.S. Bank's motion for summary judgment as to Count III.

## II. Motion to Exclude George D. Thompson's Expert Testimony

U.S. Bank moves to exclude the testimony of Equity Bank's damages expert, George D. Thompson ("Thompson"), pursuant to Rule 702 of the Federal Rules of Evidence and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (*See* Doc. No. 124.)

Before accepting the testimony of an expert witness, the trial court is charged with a "gatekeeper" function of determining whether an opinion is based upon sound, reliable theory, or whether it constitutes rank speculation. *Daubert*, 509 U.S. at 589-90. In *Daubert*, the Supreme Court imposed an obligation upon trial court judges to ensure that scientific testimony is not only relevant, but also reliable under the Rules of Evidence. *Id.* at 579.

The proposed expert testimony must meet three prerequisites to be admissible under Federal Rule of Evidence 702. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical or other specialized knowledge must be useful to the fact-finder in deciding the ultimate issue of fact." *Id.* "[I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001). Second, the proposed expert must be qualified. *Id.* Third, the proposed evidence must be reliable. *Id.* The proponent of the expert testimony bears the burden to prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

In determining whether the proposed expert testimony is reliable, the Court considers: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known rate of potential error; and (4) whether the theory has been generally accepted. *See id.* at 593-94. The purpose of these requirements "is to make certain that an expert, whether

basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

In *Kuhmo Tire*, the Supreme Court determined, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* In other words, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony. *Id.* The objective of that requirement is to ensure the reliability and relevancy of expert testimony. *Id.*

The Court's focus should be on whether the testimony is grounded upon scientifically valid reasoning or methodology. *United States v. Dico, Inc.*, 266 F.3d 864, 869 (8th Cir. 2001). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001).

U.S. Bank argues that Thompson's testimony is unreliable. (*See* Doc. No. 145.) U.S. Bank asserts that Thompson bases his opinion exclusively on a simplistic valuation approach that used a speculative price-to-earnings multiple derived from revenues of whole banks. (*See id.* at 5-8.) U.S. Bank also asserts that Thompson relies on an unfounded assumption that First Community Bank's mortgage division was destroyed in

its entirety in forming his opinion.  (*See id.* at 9-12.)  U.S. Bank further contends that

Thompson includes revenue generated by First Community Bank from loan sales to

U.S. Bank in his calculations, despite the undisputed fact that the Correspondent

Agreements were terminable at will.  (*See id.* at 12-16.)

Equity Bank, on the other hand, argues that Thompson's opinions and testimony

are reliable.  (*See* Doc. No. 154.)  Contrary to U.S. Bank's assertions, Equity Bank

maintains that Thompson does not rely exclusively on a price-to-earnings multiple in his

valuation approach, but rather corroborates his damages analysis by reviewing documents

showing the volume of mortgage originations of First Community Bank's mortgage

business prior to U.S. Bank's termination of the agreements as well as Equity Bank's

volume of mortgage originations before and after the merger.  (*Id.* at 8.)  Equity Bank

contends that "contrary to U.S. Bank's suggestion, Mr. Thompson's valuation is clearly

not based on speculation but based on comprehensive data compiled by seasoned

professionals."  (*Id.* at 14.)  Equity Bank contends that because First Community Bank

"maintained accounting records for its mortgage division, Thompson was able to treat the

division as, functionally, a branch of the bank, and value it."  (*Id.* at 12.)  In addition,

Equity Bank argues that, contrary to U.S. Bank's assertions, the evidence shows "the

elimination of essentially the entire mortgage division."  (*Id.* at 16.)  Finally, Equity Bank

argues that "Thompson considered the termination of the correspondent lending

agreements" in his valuation.  (*Id.* at 13.)

After considering the relevant factors, the Court finds that Equity Bank has

demonstrated that Thompson's opinions are sufficiently reliable to meet the threshold of

admissibility, subject to a proper foundation being laid at trial.  *See Kumho Tire*, 526 U.S. at 141, 152; *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002); *Bonner*, 259 F.3d at 929-30.  Contrary to U.S. Bank's assertions, Equity Bank has sufficiently shown that the methodology used by Thompson comports with accepted industry methods and was properly applied to the facts of this case such that it passes muster under *Daubert*. Moreover, U.S. Bank's challenges, at their core, appear to go to the foundation, weight, and credibility of Thompson's testimony rather than its admissibility.  As such, U.S. Bank may test the foundation and credibility of Thompson's testimony, including his methodology, on cross-examination, rebut the testimony with its own witnesses, and submit its own contrary expert evidence.  The jury can thus consider the credibility of Thompson's testimony and determine the weight to be given to the testimony.  Therefore, U.S. Bank's *Daubert* motion is denied.

## CONCLUSION

For the reasons described above, summary judgment for Equity Bank is appropriate with respect to Counts I-III of U.S. Bank's Amended Complaint.  Issues of fact, however, remain with respect to Count IV.  The Court also grants summary judgment, in part, for U.S. Bank with respect to Count III of Equity Bank's Amended Complaint, but denies the motion with respect to Counts I and II, which remain for trial. Finally, the Court denies U.S. Bank's motion to exclude Equity Bank's expert testimony.

# ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Equity Bank's Motion for Summary Judgment (Doc. No.

[120]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      Equity Bank is entitled to judgment with respect to Counts I,

II, and III of U.S. Bank's Amended Complaint (Doc. No. [26]), which are

**DISMISSED WITH PREJUDICE**.

b.      Count IV of U.S. Bank's Amended Complaint (Doc.

No. [26]) remains for trial.

2.      U.S. Bank's Motion for Summary Judgment (Doc. No. [126]) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

a.      U.S. Bank is entitled to judgment with respect to Count III of

Equity Bank's Amended Complaint (Doc. No. [57]), which is **DISMISSED**

**WITH PREJUDICE**.

b.      Counts I and II of Equity Bank's Amended Complaint (Doc.

No. [57]) remain for trial.

3.      U.S. Bank's Motion to Exclude Expert Testimony (Doc. No. [124]) is

**DENIED**.


Dated:  March 27, 2015                    s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge